CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

APR 05 2012

JULIA C. DUDLEY, CLERK
BY:
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| JEREMY G. HARVEY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:11-cv-00073 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| MERRILL LYNCH LIFE INSURANCE | ) | |
| COMPANY, now known as | ) | |
| TRANSAMERICA ADVISORS | ) | By: Hon. Glen E. Conrad |
| LIFE INSURANCE COMPANY, | ) | Chief United States District Judge |
| | ) | |
| Defendant. | ) | |

This case turns on the plaintiff's claim that an insurance company breached a variable annuity contract between the parties by failing to make scheduled monthly payments provided for in the contract. The insurance company has filed a motion to dismiss the complaint for failure to state a claim upon which relief may be granted, arguing that two separate affirmative defenses—res judicata and the statute of limitations—entitle it to a dismissal. For the reasons set forth below, the court will grant the defendant's motion.

I.  **Factual and Procedural Background**[1]

Jeremy G. Harvey ("Harvey") originally filed this action in the Albemarle County Circuit Court on October 18, 2011, naming as defendant Transamerica Advisors Life Insurance Company ("Transamerica"), formerly known as Merrill Lynch Life Insurance Company ("MLLIC").[2] (Docket No. 1-3.) Thereafter, on November 22, 2011, Transamerica removed the

---

[1] The following facts contained in the complaint are accepted as true for purposes of the pending motion. Erickson v. Pardus, 551 U.S. 89, 94 (2007).

[2] According to the complaint, MLLIC is a corporation licensed to transact business in Virginia. (Docket No. 1-3 at ¶ 4.) Prior to December 28, 2007, MLLIC was a wholly owned subsidiary of Merrill Lynch Insurance Group, Inc., which was an indirect wholly owned subsidiary of Merrill Lynch & Co., Inc. (Id.) MLLIC sells annuity products, including variable annuities, modified guaranteed annuities, and immediate annuities. (Id.) On December 28, 2007, Aegon USA, Inc. acquired MLLIC. (Id.) Thereafter, in September 2010, MLLIC changed its name to Transamerica Advisors Life Insurance Company. (Id.)

action to the United States District Court for the Western District of Virginia, Charlottesville Division. (Docket No. 1.)

According to the complaint, Harvey was married to Betty Knight Scripps ("Scripps") from February 14, 1998 to December 14, 2004, when the couple divorced. (Docket No. 1-3 at ¶ 2.) However, Harvey and Scripps remarried on Valentine's Day in 2006, but divorced again shortly thereafter. (Id.) At all relevant times, Scripps was, and continues to be, an "Ultra High Net Worth" client of Merrill Lynch, Pierce Fenner & Smith Incorporated ("Merrill Lynch"). (Id. at ¶ 3.) On January 17, 2001, Scripps gave Harvey $1,000,000.00 as a gift to be invested in an annuity contract in Harvey's name. (Id. at ¶ 5.) At Scripps' direction, $1,000,000.00 was transferred from her personal Merrill Lynch account to Harvey's personal Merrill Lynch account so that Harvey could purchase the annuity contract. (Id. at ¶ 6.) On January 18, 2001, a $1,000,000.00 variable annuity contract ("Contract") was purchased from MLLIC in Harvey's name using the funds gifted to Harvey by Scripps. (Id. at ¶ 7.)

Harvey received the original Contract on January 19, 2001. (Id. at ¶ 12.) According to the contractual language, Harvey is the owner of the Contract and, as such, is entitled to exercise all rights under the Contract. (Id. at ¶ 11; Docket No. 1-4 at 3–4.) One of these rights was the right to cancel the Contract within ten days after its receipt, by returning or mailing the Contract to MLLIC or to Harvey's financial consultant at Merrill Lynch, Karen L. McKinley ("McKinley"). (Docket No. 1-3 at ¶ 13; Docket No. 1-4 at 2.) The Contract provides that, to be effective, all notices, changes, and choices made by the owner of the Contract must be in writing, signed, and received by MLLIC's service center. (Docket No. 1-3 at ¶ 14; Docket No. 1-4 at 5.) Harvey alleges that he never exercised his right to cancel the Contract. (Docket No. 1-3 at ¶ 15.) Harvey never returned or mailed the Contract to MLLIC or to McKinley—in fact, Harvey alleges, he retained custody of the original Contract and still maintains possession of it today.

2

(Id. at ¶¶ 16–17.) Furthermore, in late January or early February 2001, Harvey received from Merrill Lynch a portfolio summary and account statement, which represented and confirmed that Harvey indeed owned the Contract. (Id. at ¶ 26.) As the owner of the Contract, Harvey was entitled to receive under the Contract monthly payments of $8,300.00 beginning on February 14, 2001, and continuing each month until March 1, 2034. (Id. at ¶ 18.)

On February 1, 2001—outside the ten-day cancellation period—McKinley faxed a letter to MLLIC in which McKinley, according to the complaint, knowingly made the following false statement: "At the request of the client, Jeremy G. Harvey, we wish to exercise the ten-day 'free look' prerogative to cancel and rescind the above referenced annuity contract, effective today." (Id. at ¶ 28; Docket No. 1-5 at 2.) Harvey did not authorize McKinley to cancel his Contract. (Docket No. 1-3 at ¶ 30.) Furthermore, according to Harvey, McKinley concealed the February 1 cancellation notice from Harvey—he did not learn of the fax until August 2010. (Id. at ¶ 31.) Harvey further alleges that McKinley was acting on behalf of Scripps when she faxed the cancellation letter to MLLIC, an allegation substantiated by an email sent on February 1, 2001 to MLLIC by one of McKinley's assistants to confirm that the assistant had faxed McKinley's letter "to cancel and rescind the . . . contract . . . in the name of Jeremy G. Harvey, per request of the client." (Id. at ¶¶ 32–33.) According to the complaint, the client referenced in the email was Scripps, not Harvey, evidenced by the fact that the email concluded by saying "[t]hank you for your help regarding of High Net Worth client." (Id. at ¶ 33.) Harvey asserts that McKinley's purported cancellation of the Contract was ineffective (1) because McKinley was not acting as an agent of Harvey, (2) because the purported cancellation occurred outside of the ten-day cancellation period, and (3) because the original Contract was never returned to MLLIC. (Id. at ¶ 34.)

Despite these three points, however, MLLIC extracted the $1,000,000.00 out of the market and purported to cancel the Contract pursuant to McKinley's instructions. (Id. at ¶ 37.) On February 2, 2001, MLLIC returned the $1,000,000.00 to Harvey's personal account. (Id. at ¶ 38.) However, three days later, on February 5, MLLIC withdrew the $1,000,000.00 from Harvey's account without his knowledge or consent, and transferred the funds back to Scripps. (Id. at ¶ 39.) Although MLLIC did not give Harvey a copy of the February 1 cancellation notice sent by McKinley, Harvey received from MLLIC sometime prior to March 9, 2001 a "Confirmation of Activity," which stated that "[y]ou have chosen to exercise your right to cancel the annuity under the Free Look provision." (Id. at ¶ 41.) The Confirmation of Activity stated that the Contract proceeds had been redirected into Harvey's Merrill Lynch account. (Id.) Although Harvey contacted MLLIC, he was never offered an explanation concerning the cancellation of his Contract. (Id.)

Thereafter, Harvey spoke with Scripps (to whom Harvey referred as his "Baby Bear") about the situation concerning his Contract, but Scripps repeatedly assured him not to worry. (Id. at ¶ 42.) "Out of respect for Scripps and based upon Scripps' representations, repeated often between 2001 and 2004, Harvey did not pursue MLLIC for an explanation as to what had happened to his Contract." (Id.)

Finally, Harvey alleges, MLLIC (and now Transamerica) has failed to make the monthly payments to Harvey that are due each month under the Contract (that were scheduled to begin on February 14, 2001). (Id. at ¶ 43.) Based on these factual allegations, Harvey initiated a breach of contract action against Transamerica, in which he seeks damages in the amount of $1.5 million.

On December 16, 2011, Transamerica filed a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss the complaint for failure to state a claim upon which may be granted. (Docket

4

No. 16.) In its accompanying brief, Transamerica argues that the complaint should be dismissed, first, because the doctrine of res judicata applies and, second, because the complaint is barred by the applicable statute of limitations. (Docket No. 17.) Harvey filed his response on December 22, 2011, asking the court to deny the motion. (Docket No. 18.) Transamerica filed its reply brief on January 6, 2012. (Docket No. 21.) The court heard oral argument on the motion on March 1, 2012. The matter is therefore ripe for disposition.

## II.   Discussion

### 1.   Standard of review

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; 'importantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999) (quoting Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992)). Thus, the proper inquiry is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support [its] claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). The court must accept all of the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Edwards, 178 F.3d at 244. Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of [its] 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted). Assuming that the factual allegations in the complaint are true, they "must be enough to raise a right to relief above the speculative level." Id.

## 2. Analysis

As stated above, Transamerica advances two arguments in support of its motion to dismiss. Because, as explained below, the court will grant Transamerica's motion to dismiss based on its statute of limitations argument, the court will not address its alternative res judicata argument.

The Code of Virginia provides that an action for breach of a written contract must be brought within five years after the cause of action accrues. Va. Code § 8.01-246 (West 2012). The cause of action accrues, and the accompanying limitation period begins to run, "when the breach of contract occurs . . . and not when the resulting damage is discovered." Id. § 8.01-230. Both parties agree that the Contract was breached in the instant case in February 2001 when MLLIC purported to cancel the Contract contrary to its terms and returned the $1,000,000.00 to Harvey's account. See, e.g., Philip Morris USA, Inc. v. Appalachian Fuels, LLC, Action No. 3:08-CV-527, 2009 WL 1011650, at *6 (E.D. Va. Apr. 15, 2009) (determining that one party's purported cancellation of the contract, contrary to the terms of the agreement, constituted a breach of contract). Hence, by the admission of both parties, a cause of action for breach of contract arose at that time. However, the parties disagree on when the limitations period began to run against Harvey's breach of contract claim. Transamerica contends that the limitations period began to run in February 2001, when the breach occurred. Harvey takes issue with Transamerica's approach and, instead, advances two separate theories regarding when the limitations period began to run. First, Harvey asserts that, if the court deems the Contract to be indivisible, the limitations period would not begin to run against his right of action[3] until 2034, the time fixed by the Contract for full and final performance. See Andrews v. Sams, 353 S.E.2d 735, 738 (Va. 1987); Simpson v. Scott, 53 S.E.2d 21, 24 (Va. 1949). Second, Harvey contends

---

[3] A right of action "is the right to presently enforce a cause of action." Westminster Investing Corp. v. Lamps Unlimited, Inc., 379 S.E.2d 316, 317 n.1 (Va. 1989).

in the alternative that, if the court deems the Contract to be a divisible installment contract, then each successive failure by Transamerica to disburse the monthly payments called for by the Contract would constitute a new injury and, thus, a new breach, and would therefore give rise to a separate cause of action. See Am. Inn, L.P. v. SunTrust Banks, Inc., 28 F. App'x 316, 320–21 (4th Cir. 2002) (per curiam); Am. Physical Therapy Ass'n v. Fed'n of State Bds. of Physical Therapy, 628 S.E.2d 928, 929 (Va. 2006). Under the latter theory, Harvey argues, the statute of limitations would not bar his claim for damages that occurred in the five-year period directly preceding the filing of his lawsuit.

After considering the arguments advanced by the parties[4] and surveying the relevant case law (which the court agrees does not chart a completely clear course), the court determines that the statute of limitations operates to bar Harvey's complaint in this case.

Initially, the court notes that the case law from the Supreme Court of Virginia does not support Harvey's classification of the Contract as indivisible. The "indivisible contract" doctrine, also known as the "continuing undertaking" doctrine, has been recognized by the Supreme Court of Virginia "only with regard to a continuous or recurring course of professional services related to a particular undertaking." Harris v. K & K Ins. Agency, Inc., 453 S.E.2d 284,

---

[4] The court rejects Harvey's contention that the court may not consider Transamerica's statute of limitations defense on this Rule 12(b)(6) motion to dismiss. The United States Court of Appeals for the Fourth Circuit has stated:

> A motion under Rule 12(b)(6) is intended to test the legal adequacy of the complaint, and not to address the merits of any affirmative defenses. In the limited circumstances where the allegations of the complaint give rise to an affirmative defense, the defense may be raised under Rule 12(b)(6), but only if it clearly appears on the face of the complaint.

Richmond, Fredericksburg & Potomac R.R. Co. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993); see also 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 708–10 (3d ed. 2004) ("[T]he complaint also is subject to dismissal under Rule 12(b)(6) when its allegations indicate the existence of an affirmative defense . . . ; but for this to occur, the applicability of the defense has to be clearly indicated and must appear on the face of the pleading to be used as the basis for the motion." (footnote omitted)). "A complaint showing that the governing statute of limitations has run on the plaintiff's claim for relief is the most common situation in which the affirmative defense appears on the face of the pleading and provides a basis for a motion to dismiss under Rule 12(b)(6) . . . ." Wright & Miller, supra, § 1357, at 714.

286 (Va. 1995). The Supreme Court of Virginia has applied the doctrine "in cases stating claims of breach of contract or negligence involving the professional services of physicians, attorneys, and accountants." Id.; see also, e.g., Allen F. Johnson & Assocs., LLC v. Port Sec. Int'l, LLC, 429 F. App'x 281, 284 (4th Cir. 2011) (per curiam) (applying the indivisible contract doctrine to a consulting services contract); Suffolk City Sch. Bd. v. Conrad Bros., Inc., 495 S.E.2d 470, 473 (Va. 1998) (applying the indivisible contract doctrine to a construction services contract); Cnty. Sch. Bd. of Fairfax Cnty. v. A.A. Beiro Constr. Co., 286 S.E.2d 232, 233 (Va. 1982) (same). However, even if the indivisible contract doctrine extends further than just to contracts for recurring professional services, the doctrine does not apply to contracts that provide for installment payments at fixed, scheduled times. Cf. Heirs of Roberts v. Coal Processing Corp., 369 S.E.2d 188, 190 (Va. 1988) (concluding that a land use lease agreement differed from contracts providing for payments in specified installments and, accordingly, was an indivisible contract because it contained no fixed time or schedule of times for performance and because the lessees' contractual obligations were triggered only by events entirely within the lessees' control).

On the other hand, the case law does support Harvey's categorization of the Contract as a divisible installment contract, based on the Contract's provision for fixed, monthly payments. See Jones v. Morris Plan Bank of Portsmouth, 191 S.E. 608, 610 (Va. 1937) (announcing the general rule that an installment contract is considered divisible); see also, e.g., Am. Inn, L.P., 28 F. App'x at 320 ("Because SunTrust billed American Inn for principal payments and interest on a monthly basis, and American Inn paid in monthly installments for the duration of the Note, . . . the district court correctly characterized the note as an 'installment' contract and not an 'indivisible' contract."). However, the mere fact that a particular contract splits up the required performance into separate installments does not necessarily require that the contract be treated as

8

a divisible installment contract for purposes of determining when the applicable statute of limitations begins to run against the plaintiff's right of action. Legard v. EQT Prod. Co., No. 1:10cv00041, 2011 WL 86598, at *8 (W.D. Va. Jan. 11, 2011) (Magistrate's Report and Recommendation) (adopted by Order, 2011 WL 4527784 (W.D. Va. Sept. 28, 2011)) (examining Virginia case law on contracts requiring payments or performance at specific intervals and observing that the case law "does not mean . . . that every contract that calls for multiple payments is a divisible installment contract").

In Hunter v. Custom Business Graphics, 635 F. Supp. 2d 420 (E.D. Va. 2009) (Doumar, J.), the United States District Court for the Eastern District of Virginia considered an employment agreement that arguably could have been deemed a divisible installment contract. The agreement required the employer to pay the employee an automobile allowance in monthly installments of $100.00, and further required the employer to compensate the employee with periodic commission payments. Id. at 422–23. However, in determining whether to treat the contract as divisible for purposes of the operation of the statute of limitations, the court focused on the nature of the employer's contract breaches. The employer, beginning in January 1990, ceased providing the monthly automobile payments required by the contract and, beginning in January 1997, reduced the employee's commission rate from the rate called for in the contract. Id. at 430. In rejecting the employee's contention that each successive breach gave rise to a separate, additional injury and, thus, a new cause of action, Judge Doumar observed that a "survey of Virginia case law indicates that the answer to th[e] question [of whether there was a series of contract breaches, or only one breach] depends entirely upon the nature and type of each individual transaction that supposedly constituted a breach." Id. at 431; see also Am. Physical Therapy Ass'n, 628 S.E.2d at 929 ("Whether the [defendant]'s actions constituted a

single continuing breach . . . or a series of separate breaches . . . depends upon the relevant facts.").

The <u>Hunter</u> court then considered three separate cases from the Supreme Court of Virginia. In <u>Westminster Investing Corp. v. Lamps Unlimited, Inc.</u>, 379 S.E.2d 316 (Va. 1989), the Supreme Court of Virginia determined that, where a landlord from the inception of a lease failed to enforce a provision pertaining to uniform hours of operation for all tenants in a shopping center, the complaining tenant's cause of action accrued on the day of the landlord's initial breach. <u>Id.</u> at 318. In reaching this determination, the Court rejected the plaintiff's contention that a new cause of action accrued each day that the landlord failed to enforce the lease provisions, concluding instead that the initial failure to enforce the lease provisions inflicted the whole injury sustained by the plaintiff. <u>Id.</u> at 318–19.

In <u>Hampton Roads Sanitation District v. McDonnell</u>, 360 S.E.2d 841 (Va. 1987), the Supreme Court of Virginia examined whether intermittent discharges of raw sewage from a county pumping station gave rise to one cause of action that accrued with the initial discharge, or separate causes of action that accrued with each discharge. <u>Id.</u> at 843–44. In considering this question, the Court stated that, "[i]f the wrongful act is of a permanent nature and one that produces 'all the damage which can ever result from it, [then] the entire damages must be recovered in one action,' and the statute of limitations begins to run from the date of the wrongful act," but if the wrongful acts are not continuous and "occur only at intervals, each occurrence inflicts a new injury and gives rise to a new and separate cause of action." <u>Id.</u> at 843. The Court in <u>Hampton Roads</u> ultimately concluded that the initial discharge did not inflict the entire injury on the landowner's property, but instead, that each noncontinuous, intervening discharge meted out a new injury—for this reason, the Court determined, the landowner could

bring his claims for damages that occurred in that five-year period directly preceding the filing of his lawsuit. Id. at 844.

In American Physical Therapy Association v. Federation of State Boards of Physical Therapy, 628 S.E.2d 928 (Va. 2006), the defendant had assumed from the plaintiff the duty of administering an examination, with the contractual understanding that the defendant would establish prices for the examination "that are generally consistent . . . with prior levels and which are not unduly burdensome to candidates." Id. at 929. The defendant increased the fee from $90 to $185 in 1995 and, again, to $285 in 2000. Id. The question presented by the case was whether the statute of limitations barred the plaintiff's claim that the defendant breached the contract because the fee increases that the defendant imposed gave rise only to one cause of action that accrued in 1995 when the defendant first increased the fee. Id. The Court determined that the term "shall establish prices" did not impose an obligation that was "continuing in nature" like the obligation of the landlord in Westminster. Id. Instead, the term contemplated a "distinct obligation that arises each time the [defendant] imposes a new fee." Id. at 930. "As in Hampton Roads, the first injury did not inflict 'all the damage which can ever result[]'; rather, each time the [defendant] imposed a new fee, a new injury occurred and a separate cause of action accrued." Id.

After considering these three cases, Judge Doumar determined in Hunter that the factual situation in that case more closely mirrored the circumstances in Westminster, than those of Hampton Roads and American Physical Therapy Association. In support of this determination, the Eastern District of Virginia noted that the contractual term in American Physical Therapy Association "clearly envisioned that the defendant would on more than one occasion establish different prices for the Examination." Hunter, 635 F. Supp. 2d at 432. "It follows," the Eastern District stated, "that the mere failure on the part of the plaintiff to challenge the first change in

11

price—which could have been consistent with prior price levels and therefore not have been in breach of the contract—should not have barred the plaintiff from suing for later changes in price that were in breach of the contract." Id. at 432–33. In contrast, the employer in Hunter breached the contract when it ceased paying the monthly automobile allowance and when it reduced the commission rate. Id. at 433. Unlike the contractual language in American Physical Therapy Association "that envisioned and permitted price changes, neither action—the cessation of the monthly allowance or the change in the commission rate—was permitted or envisioned by the contract language." Id. "Consequently, each subsequent failure to pay did not constitute a new breach, but merely a continuation of the original breach as in Westminster." Id. The court concluded:

> In Hunter's situation, there was nothing 'new' about [the defendant]'s alleged breaches from 1990 or 1997 to the time Hunter quit working. The breach was always the same, and the Defendants never looked back to the previous pay cycle to adjust or evaluate Hunter's commission or monthly auto allowance. Rather, the Defendants regularly and systematically applied the same rates and terms of compensation as the result of the breaches which occurred in 1990 and 1997, respectively.

Id.

The court in the instant case is persuaded by the reasoning of the Eastern District of Virginia in Hunter. Succinctly stated, there is nothing "new" about Transamerica's alleged monthly breaches from February 2001 until the present. Whereas the contractual language in American Physical Therapy Association envisioned that the defendant would periodically alter the examination fee, nothing in the Contract's language in this case permitted or contemplated Transamerica cancelling the Contract in a manner contrary to its terms and returning the Contract funds. Hence, only one breach occurred in this case. Each monthly failure to make an installment payment did not constitute a new breach. Instead, each successive failure to make an installment payment, as in Westminster, was merely a continuation of the breach that occurred

when Transamerica purported to cancel the Contract in February 2001. All the injury that Harvey could suffer as a result of Transamerica's actions occurred when Transamerica purported to cancel the Contract outside of the ten-day cancellation period and returned the money—each failure to make the monthly installment payments inflicted no further injury than that which was inflicted when the Contract was purportedly cancelled and the money was returned. Consequently, the five-year statute of limitations began to run in February 2001 at the time of the first and only breach in this case. Because Harvey initiated this suit on October 18, 2011, outside of the limitations period, the statute bars his action. Accordingly, the court must grant Transamerica's motion to dismiss on the basis of the operation of the statute of limitations.

At oral argument, Harvey maintained that, as a policy matter, a dismissal of his action would stand for the undesirable proposition that a defendant can unilaterally repudiate a contract involving vested rights and then benefit from that blatant breach by hiding behind the shield of the statute of limitations. However, this argument is misplaced under the facts of this case. The law afforded Harvey a remedy for Transamerica's breach of the Contract—within five years after the breach, the law permitted Harvey to institute suit against Transamerica. The court notes that, by Harvey's own admission, Transamerica notified him sometime prior to March 9, 2001 that the Contract had purportedly been cancelled and that the Contract proceeds had been redirected into his account. (Docket No. 1-3 at ¶ 41.) However, Harvey consciously elected not to bring suit within the five-year limitations period as Transamerica predictably persisted in failing to make the scheduled monthly payments. Clearly, when the money was returned, Harvey understood that no future annuity payments would be forthcoming.

### III. Conclusion

Virginia law requires that "[s]tatutes of limitations [be] strictly enforced and exceptions thereto [be] narrowly construed." Arrington v. Peoples Sec. Life Ins. Co., 458 S.E.2d 289, 290

13

(Va. 1995); see also id. at 290–91 ("[A]ny doubt must be resolved in favor of the enforcement of the statute."). For the reasons stated above, Harvey failed to initiate this action within the five-year limitations period provided by Virginia law. Consequently, the court will grant Transamerica's motion to dismiss. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 5th day of April, 2012.

                                                              Chief United States District Judge